Reed, J.,
delivered the opinion of the court.
This was a suit in equity brought by plaintiffs in error against The Dolores Number Two Land & Canal Company, The Dolores Community Ditch Company, Joseph W. Helmer, trustee, Emerson B. Tuttle, trustee, and John Y. Far-well (beneficiary), asking for the appointment of a receiver, an injunction, an accounting, etc., etc.
It is alleged that The Dolores Number Two Land & Canal Company was organized and incorporated in January, 1887, for the purpose of constructing a canal or ditch to divert the water from the Dolores river to irrigate Montezuma valley, a valley about fifty miles in length and fifteen miles in width. *19 That before entering upon the construction of the canal the company had accurate surveys, and estimates of the cost of construction, and it is alleged that the estimated cost of sixty thousand dollars was ample to construct the main line of the canal. That the capital stock of the company was $200,000, divided into 2000 shares of $100 each. That the plaintiff, Benjamin W. Robinson and his wife, Mary H., were from and after the organization of the company bona fide owners for value of 245 shares of the capital stock. At what price per share is not stated, nor is it stated in what manner payment was made, nor is it stated who became the owners of the remaining 1755, what prices were paid or how payments were made, nor whether anything was realized from the sale of the capital stock, nor what, if any, use was made or to be made of the proceeds. The fair inference from the pleading is that the capital stock was divided among the promoters and incorporators gratuitously; for the next allegation is, that plaintiff, B. W., spent large sums of money (no amount stated), in organizing the company, and that as the authorized and accredited agent of the corporation he went to Chicago to secure a loan of $100,000, a sum $40,000 in excess of the amount alleged to be needed to construct the canal. That by his skill and enterprise he succeeded in securing a loan of $100,000 from J. Y. Farwell upon the bonds of the company. It is hard to reconcile the next allegation,— where it is said that after plaintiff had secured the loan, Far-well sent his agent, Helmer, to the state to ascertain the value of the franchise and property of the corporation, and having ascertained it to be worth a half million dollars Far-well, Helmer, and one H. H. Tuttle entered into a conspiracy to obtain possession of the entire property “ and demanded as a condition precedent ” to making the loan of $100,000 alleged to have been already secured by plaintiff — that 45 per cent of the entire capital stock be assigned and delivered to Tuttle, and further demanded that Farwell should name two members of the board of directors of the corporation. That these requirements were complied with by the company. *20 That the company issued its bonds for $100,000 on the first day of July, 1887, and on the same date executed to Helmer, as trustee, a deed of trust upon its property, rights and franchises to secure the payment of the bonds. That such deed of trust contained a provision that if default be made in the payment of interest, the whole amount, principal and interest, should become due, etc. That some time prior to July 1st, 1887, and before the $100,000 in money was paid by Farwell, “ the board of directors was reorganized in the •interest of Farwell, and from that time on Farwell had full control of the board of directors and complete management of the affairs of the company.” How the board was organized in his favor, and how he obtained full control are not stated.
It is also alleged that 45 per cent of the capital stock of the company was transferred to Tuttle for Farwell’s benefit, upon the books of the companj'-. Then follows a vague, indefinite allegation — “that immediately thereafter the said conspirators set about to ruin and wreck such company in pursuance to their original plan ” for the purpose of acquiring the property by wasting and squandering its money and leaving it insolvent. That good engineering ability was requisite in constructing the works, but none but incompetent, impracticable and visionary managers were employed, etc. That by reason of the employment of incompetent persons and of the doing of the work in an improper manner, the work was not completed, the $100,000 wasted and squandered and the company insolvent.
Then follows five closely printed pages of the abstract, alleging, in effect, that the Montezuma valley was uninhabited or nearly so; that in order to make the undertaking a success and dispose of water when carried, it was necessary to have agriculturists, users and consumers of water settle in the valley, those who would buy water rights and use water. That on the 15th day of April, 1887, plaintiff, by a ■ resolution of the board of directors unanimously passed, was appointed a “ commissioner of colonization,” to attend to the *21 peopling of the valley and superintend the construction of lateral ditches for the distribution of water, etc. That plaintiff was well qualified for the duties of the position and business of securing colonies and emigrants, and that he immediately entered upon the duties of his office. That in the ensuing month, just “ as he got fully started and his plans and purposes fully matured, * * * the board of directors of the company * * * wrongfully and fraudulently * * * compelled him to abandon the business and efforts to populate the said Montezuma valley,” and the company never employed any one else to take his place and populate the valley. That by such wrongful and fraudulent acts, and by its failure to complete the canal and furnish water, the valley, instead of being populated, densely, as he intended, was depopulated, “ and by this course of suicidal proceedings hundreds of families, which had been attracted to this valley by the said Robinson, and by reason of books by him composed, printed and circulated, were reluctantly forced to go elsewhere.'''’
The facts contained in these last allegations hardly afford a basis for equitable relief, nor is any directly asked upon them. He does not ask to be reinstated in the position he was so well qualified to fill, alleges and asks no damage, nor states that he sustained any loss, even of books and printed matter, consequently, we conclude that it was incorporated into the complaint as a part of the evidence to establish the allegations of incompetent management and want of administrative ability in the officers managing the company If the allegations are true — and they must be so regarded on demurrer — no more conclusive proof could be needed to establish incompetency or a premeditated ’ plan to “ ruin and wreck” the company, than that afforded by the fact of discharging the plaintiff and desolating the valley. Had the company completed its canal, as it is alleged it should have done, so as to furnish water in the year 1888, and retained the plaintiff to populate the valley, the undertaking must have been an eminent success. The water and the people were both needed — the water without the people was useless— *22 and could not, as required by the constitution, have been regarded as applied to a beneficial use. A certain amount of water, or fluid of some kind, is supposed to be necessary to support animal life. Ghosts and disembodied spirits are supposed capable of existence without it, and yet in its absence, they are not cheerful. Dives was anxious to obtain the smallest quantity for “ domestic purposes.” Given plenty of water — a dense, thrifty population accustomed to its use, for drinking, lavatory and irrigating purposes, was indispensable. It is evident that plaintiff had correct views; both factors, united, were needed. His removal just at the time he had fully prepared himself to enter upon the proper discharge of the duties of his office, was an indignity and an- outrage, but may have been inspired by the purest dictates of humanity. The water supply was needed at a date as early or earlier than the great influx of population. The company finding that, by the exercise of his ability, energy and zeal, the population was to precede the water, were compelled to remove him, or subject a large number of people to all the horrors of a severe and long protracted drouth.
Taking this view of it, the act may have been praiseworthy and not as supposed, “ wrongful and fraudulent.” The company was the modern “ Moses,” that was to smite the rock and render existence in the desert possible.
In the next allegation the charge is reiterated, “that the business affairs of the company have been mismanaged and conducted in a most reckless and extravagant manner, and that none but the most incompetent, untrustworthy and unskilled managers have been employed.” That the company had spent and squandered nearly double the amount estimated as the cost of construction, had squandered and thrown away, by bad management, .the $100,000 obtained — was in debt $45,000, and the work of construction not completed. Again, upon the next page it is reasserted, that Far well, Helmer and Tuttle, by willful design and incompetency, had squandered the funds of the company; that the company was in debt $45,000 and bankrupt, and applied to FarwelL *23 for an additional loan of $90,000, which was refused, unless the stockholders, without consideration, would relinquish and assign 20 per cent more of the capital stock of the company for the benefit of Farwell; that the individual stockholders, except Robinson and wife, who refused, acceded to the request and contributed the stock, and thereupon the $90,000 was loaned by Farwell. The company issued additional bonds for $90,000 and a second deed of trust was executed to secure the bonds, in which Emerson B. Tuttle was made trustee. That Farwell unlawfully extorted from the individual stockholders the 65 per cent of stock so as to obtain absolute control of the company for the purpose of wrecking it, but that plaintiffs absolutely refused to contribute to the last 20 per cent. We are nowhere informed from what source the first 45 per cent of stock was obtained, whether it was stock undisposed of and remaining in the company, or whether it was made up of individual contributions.
It is then alleged that the $190,000 was largely wasted, thrown away and “ expended for purposes other than company purposes,” (but to what extent, and for what purposes is not stated), and that both deeds of trust made to secure the two loans aggregating $190,000 are'void. The next allegation is a reiteration of the former general charges of a conspiracy to wreck and ruin the company, wasteful and incompetent management, etc., to which is added an allegation that, with proper management the cost of construction should not have exceeded $80,000. That construction could have been completed so as to have furnished water for the year 1888, and that if plaintiff, Robinson, had not been interfered with he would so have peopled the valley that an income of $30,000 might have been realized from the sale of water for the year 1888. The following allegation is more important: “ that said Farwell now owns over 80 per cent of the stock of said company, the greater part of which he acquired wrongfully and without any consideration and in derogation of the rights of these complainants.” How obtained wrongfully and without consideration is not stated.
*24 In regard to the first 45 per cent it is alleged that it was required as a bonus or gratuity, as a condition precedent to the loaning of the $100,000 that the demand was complied with. If such was a fact he legally obtained the stock, and its transfer was the result of a mutual agreement; the demand could be declined or complied with at the option of the other party. The same may be said of the 20 per cent demanded as a condition for the loan of the $90,000. It appears that plaintiffs did not contribute stock to satisfy either demand; that they were at the beginning and still are the holders of 245 shares. It seems that those who parted with stock as contributors regarded the securing of the money as a proper consideration. They are not complaining. How the securing of the stock from other individual holders was in derogation of the rights of plaintiffs is not stated, and we are at a loss to discover. If others saw fit to part with their stock, to Far well, without consideration, such fact cannot be a ground for equitable relief of plaintiffs. How Farwell became the owner of the other 15 per cent to make the 80 per cent is not shown, but it is presumed he acquired it legitimately, otherwise, we would be informed. If, as alleged, Far-well holds over 80 per cent of the entire stock and plaintiffs’ 245 shares, there is at most but about 150 shares outstanding in others. It is next alleged that on-or about the (blank) day of (blank) year The Dolores Humber Two Land and Canal Company made an attempted conveyance of all its water rights, privileges, franchises and property-in the same, and the right to sell all the water rights and water and the right to receive all the future revenue to be derived from the sale of water belonging to it, to the Dolores Communitjr Ditch Company, at the instigation of the conspirators, etc. “ That said attempted conveyance is a fraud and void in law and equity, and a fraud upon these complainants and all innocent stockholders.” These allegations are so vague, mysterious, indefinite and indeterminate that it is impossible to seriously consider them. If, as stated, it was only an attempt to convey, it, of course, was not consummated, no one *25 was injured. If it was “ void in law and equity,” “ void tilings ” are no things and require no notice. Whether it was a reorganization under a new name of the same corporation or a new and distinct corporation, whether the capital stock of the first corporation was increased, whether the scope and object of the new corporation were extended and enlarged, whether any consideration, nominal or otherwise, passed or was to pass, whether the possession passed from the old company to the new, whether the new company was capitalized and issued stock, we are not informed. The only information we have is “ The organization of the said second company * * * by the same parties and for the same purposes, has so confused and complicated the legal constitution and status of both said companies, that it is almost utterly impossible for said companies or either of them to carry on the business,” etc. This, certainly, would be the result, where two corporations created for the same purpose, and controlling the same property and rights, attempted, at the same time, to exercise such control. It is a condition without precedent, and without some facts stated, — some data,— it is impossible to say whether it is fair or fraudulent, legal or illegal. It certainly appears opposed to natural law — two bodies occupying the same space at the same time.
But it appears in the next allegation that the original corporation still retained sufficient vitality to exercise the important prerogative of levying assessments upon its stock, and that in the exercise of it, plaintiffs had been assessed to pay $1,347.50. That there was no necessity for such assessment; that it was made by the conspirators to force a sale of plaintiffs’ stock and buy it in, and that plaintiffs refused to pay .such assessment. This is again followed by the general charges of mismanagement, incompetency, want of skill in employees, fraud and dishonesty, and upon “ information and belief,” collusion and conspiracy to wreck and ruin both companies. Then that plaintiffs, prior to commencing suit appeared before the board of directors and protested and complained and begged it to reform and correct their grievous *26 wrongs; that the requests were unheeded — the eloquence wasted.
The first part of the prayer is in the disjunctive or alternative, asking that a receiver be appointed to complete the construction of the work and disburse the money, or that an injunction issue to restrain the company from prosecuting the work and disbursing the money, and from proceeding to enforce the collection of the assessments against the plaintiffs ; that the two trust deeds be decreed to be void and canceled, and for a full accounting of all moneys disbursed. This lengthy review of the complaint may seem unnecessary, but it is as brief a digest or synopsis of thirty-one closely printed pages as can be made for a proper understanding of the case. A demurrer was interposed specifying eighteen supposed fatal defects in the pleading, which may be jcansolidated and summarized in one, viz., that the complaint was bad for want of substance; did not state facts sufficient to entitle plaintiffs to the relief asked. The demurrer was sustained. The judgment is brought here for review.
In this case the well established rules and principles that control pleadings in equity, have been overlooked or disregarded. The conclusions of the pleader, stated as facts, broad generalizations, sweeping and comprehensive assertions of conspiracy, fraud, mismanagement and incompetency cannot be made, in pleading, to supply the want of specific facts.
“ The allegations must he positive, and not by way of recital ; and must be of facts only, and not of law.” Mitford & Tyler’s Eq. Plead. 64.
“ The rights of the several parties, the injury complained of, and every other necessary circumstance, as time, place, manner, or other incidents, ought to be plainly, yet succinctly alleged. Whatever is essential to the rights of the plaintiff, and is necessarily within his knowledge, ought to be alleged positively and with precision.” Ibid. 136; Story’s Eq. Plead. §§ 27, 28, 246-257.
Fraud is a conclusion of law, from the fact stated. It is *27 not sufficient in the bill to make a charge of fraud in general terms. It should point out and state particular acts of fraud. Story’s Eq. Plead. §§ 251, 251a.
The capital stock of a corporation is usually the original and only source from which the money is obtained for the prosecution of the enterprise. By sec. 340, chap. 19 of the statutes it is declared: “No corporation shall issue stock or bonds, except for labor done, services performed, or money or property actually received.” A careful examination of the authorities establishes the legal fact that the stock of a corporation is the basis from which is derived the capital; that the stock is regarded as money or its equivalent. It is alleged that the capital stock of the company was $200,000; that it passed to the stockholders. Had it been disposed of at 50 per cent of its par value, the fund obtained would, according to the allegations of the complaint, have been ample to have completed the enterprise. From the complaint it appears that not a dollar of proceeds of stock ever went into the treasury, and that all the money received and used came from the Farwell loans. From the allegations, it is presumable that the stock was issued and used for gratuitous, distribution among the promoters. The allegation is that plaintiffs were the “ bona fide owners and holders of said capital stock,” but it is not alleged that any value whatever was paid for it. If, as stated, Farwell furnished all the money for 65 per cent of the stock, and the others were the gratuitous holders of the remaining 35 per cent, and he afterwards by purchase obtained over 15 per cent more, and then through his agents took absolute and entire control of the management, construction and disbursement of money — if the management was bad, his agents incompetent, the money wasted, etc., it would seem that he, Farwell, was the only one who could suffer pecuniarily, and could hardly be amenable to the oft-reiterated charge of conspiracy to ruin and wreck a company in which he would be the only sufferer. He is charged, in effect, with wasting his own money and wrecking himself to the extent of 80 or 85 per cent to effect the ruin *28 of the other 15 or 20 per cent. If such were the facts, Far-well might be benefited by the appointment of a conservator or guardian, but a court of equity could hardly appoint a receiver, as asked, to administer his affairs; nor can the court, by injunction, restrain him from wastefully disbursing his money, or mismanaging his affairs; nor can it, in the absence of stated facts, showing the invalidity of the assessment, restrain its collection. A minority of a corporation is undoubtedly entitled to the interposition of a court of equity to protect it from the illegal aggression of the majority-; but the wrongs charged, the imminency of the danger, and the rights of the minority, must be clearly and explicitly stated by apt averments.
The court is asked to decree both deeds of trust, made to secure the money borrowed, absolutely void and of no effect. Why this should be done is not shown. To enable a court to so decree, some invalidity or illegality in their inception and execution must be shown, or a failure or want of consideration. Neither is attempted. A misapplication and waste of the ■ money received in exchange for a security would not afford a court adequate grounds for invalidating the security given.
It follows that the judgment of the court in sustaining the demurrer and dismissing the suit was correct.

Affirmed.